THE WEST CHICAGO STREET RAILROAD COMPANY *et al.*

*v.*

THE MORRISON, ADAMS & ALLEN COMPANY.

*Filed at Ottawa January 20, 1896—Rehearing denied March 17, 1896.*

1. APPEALS AND ERRORS—*presumption, on appeal, that trial court entered order upon its own knowledge.* It will be presumed, on appeal, that the trial court, in denying a motion to set aside an order extending the time to file the bond and bill of exceptions, acted upon its own knowledge of the authority by virtue of which such order was made, notwithstanding an affidavit of a clerk that the judge of another court directed the entry of such order.

2. SAME—*when bill of exceptions filed nunc pro tunc will not be stricken.* A bill of exceptions submitted to the trial court within the extended time allowed for filing it, will not be stricken from the record because it was, after the expiration of the time, signed and sealed as of the date of its presentation, and ordered to be filed *nunc pro tunc* as of that date.

3. PLEADING—*effect of plea of liberum tenementum.* The trespass is not admitted, in an action of trespass, by a plea of *liberum tenementum,* where a plea of not guilty is also filed.

4. EVIDENCE—*to charge street railway company for act of construction company.* Evidence that a trespass was committed by the servants of a tunnel company, organized as a mere instrument of a street railway company for the construction of its tunnel at the orders and instigation of the president of the street railway company, who had no direct personal or individual interest and who was not an executive officer of the tunnel company, is sufficient to sustain a finding that the railway company was a party to the trespass.

5. REAL PROPERTY—*when secret agent is an owner as to third persons.* One who, as a secret agent for a corporation, purchases a building in his own name by a deed affording no indication of agency, and is allowed to lease it and collect rents, is, as to third persons having no notice of the secret agency, the absolute owner, although he has given an unrecorded quit-claim deed to the corporation.

6. NOTICE—*possession of building is notice of tenant's rights.* Possession of a building is constructive notice of the right of the possessor under a parol lease in extension of a previous written lease.

7. LANDLORD AND TENANT—*lease may be effected without using the word "lease."* The use of the word "lease," in a parol agreement for the occupancy of a building by a tenant after the expiration of his term, is not essential to make the agreement a lease, where it is, in fact, a leasing or renting for an additional term.

8. CONTRACTS—*parol extension of tenant's term—validity.* A parol agreement, made before the expiration of a lease under seal, for the occupation by the lessee of the premises after the expiration of the lease, until terminated by thirty days' notice, is not invalid, as a parol modification of an executory contract under seal.

9. DAMAGES—*for willful trespass by landlord upon the leased premises.* Damages for willful, wanton and malicious trespass by a landlord upon the leased premises are not limited by a provision of the lease allowing a certain time for the repairing of machinery by the lessor, and limiting his liability to a certain sum for horse power as liquidated damages.

10. SAME—*verdict in excess of actual damages—exemplary damages.* A verdict will not be disturbed, as in excess of the actual damages sustained, where the case is one in which exemplary damages might properly be allowed.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

EDMUND FURTHMANN, for plaintiffs in error.

CHARLES SHACKLEFORD, for defendant in error.

Mr. JUSTICE BAKER delivered the opinion of the court:

A motion is made by defendant in error to strike from the record the bill of exceptions taken by the plaintiffs in error. The record shows, in regard thereto, the following state of facts: On February 15, 1894, it being one of the days of the January term, 1894, of the circuit court of Cook county, the final judgment herein was rendered and an order entered of record fixing twenty days thereafter as the limit of time within which the plaintiffs in error might file their appeal bond and bill of exceptions. The February term, 1894, of said court began on Monday, February 19, 1894. The twenty days allowed for bond and bill of exceptions expired on March 6, 1894, one of the days of said February term, and on that day and within the time limited, as appears from the record, the time to file the bond and bill of exceptions was extended ten days. The record states:

"And afterwards, to-wit, on the 6th day of March, A. D. 1894, the following proceedings were had and entered of record in said court, to-wit:

"Morrison, Adams & Allen Company
*vs.*                                                  } 86,412.
Charles T. Yerkes, West Chicago Street Ry. Co. *et al.*

"On motion of defendants' attorney it is ordered that the time to file the bond and bill of exceptions herein be and it is hereby extended ten days from this date."

On the 10th day of March, 1894, it being one of the days of said February term, defendant in error filed in said court its motion to set aside and hold for naught the said order of March 6.   This latter motion was heard by the court on March 15, 1894, that also being one of the days of said February term, and the court overruled the motion to set aside said order of March 6, and marked the bill of exceptions that day presented in open court as "presented March 15, 1894," and afterwards, on April 2, 1894, signed and sealed the same as of March 15, 1894, and ordered the same to be filed as of said latter date.

It is a settled rule of law that a record imports absolute verity and cannot be impeached by parol testimony. *Hansen* v. *Schlesinger*, 125 Ill. 230; *Weigley* v. *Matson*, id. 64; *Wabash, St. Louis and Pacific Railway Co.* v. *Peterson*, 115 id. 597; *Roche* v. *Beldam*, 119 id. 320; *Lawver* v. *Langhans*, 85 id. 138; *Herrington* v. *McCollum*, 73 id. 476; *Blackburn* v. *Bell*, 91 id. 434; *Garfield* v. *Douglass*, 22 id. 100; *Zimmerman* v. *Zimmerman*, 15 id. 84; *Swartz* v. *Barnes*, 11 id. 89; *Rust* v. *Frothingham & Fort*, Beecher's Breese, 331.   When the record is once made up it is conclusive upon all parties until altered or set aside by a court of competent jurisdiction, and all questions relating to the time when it was in fact made, or in regard to the authority on which it was made, or in respect to the truthfulness of its recitals, must be settled by reference to the record alone.   (*Herrington* v. *McCollum, supra.*)   But if an order is improperly entered, or does not state the facts as they actually occurred, application may be made to the court in which the record

is, to correct its record.   *Roche* v. *Beldam, supra; Herring-ton* v. *McCollum, supra.*

If we assume that the motion filed on March 10 and submitted to the circuit court on March 15, that the order entered of record on March 6 "be set aside and held for naught," is to be regarded as in substance a motion for the amendment of the record, and that the action of the circuit court in overruling said motion is properly before us for review by the assignments of cross-error on the supplemental record, yet we are unable to say that there was error in the action of the court in the premises.   It is true that the affidavit of a deputy clerk of the circuit court states that the branch of the circuit court over which Judge Clifford presides was only in session from nine o'clock A. M. until one o'clock P. M. of said sixth day of March, and then adjourned until nine o'clock of the following day, and that after such adjournment was entered Judge Hanecy, "who was then engaged in hold-ing the Criminal Court of Cook county, directed affiant, on motion of the defendants, to enter an order in the cause extending the time to file bond and bill of excep-tions ten days."   But the principle involved in what was said by this court in *Hansen* v. *Schlesinger, supra,* is equally applicable here.   It was there said (p. 236):   "It is plain, therefore, there was no error in the court in refusing to amend its record.   Indeed, it does not appear there was anything to amend by.   It seems idle to present affidavits of the clerk of the court to advise the judge presiding at the same term whether he had directed a judgment to be entered while the court was in session for business, or at an hour when he was not transacting the business of the court.   The theory of the law is, that at the same term all proceedings rest in the breast of the judge of the court, and he can amend his record according to the facts within his own knowledge."   Here, Judge Clifford not only presided at the trial and at the time of the rendi-tion of the judgment and the entry of the original order

granting time for filing bond and bill of exceptions, but he also presided in the same branch of the circuit court at the February term thereof, and on March 6, the day the extension order was made and entered of record, and on March 15, the day the motion to set aside or annul said extension order was submitted for decision and denied,—and both of said days were days of the February, 1894, term of the court. Courts have jurisdiction over their judgments and orders of a pending term, and may amend or set them aside for cause, and in doing so the judge of the court may act upon his own personal knowledge of what he had or had not done. When the court denied the motion to set aside the order of March 6, it must be presumed that the authority by virtue of which that order had been made and spread of record was within the knowledge and consciousness of the presiding judge.

The bill of exceptions taken by plaintiffs in error having been submitted to the court within the extended time allowed for filing it, it will not be stricken from the record simply because it was, after the expiration of that time, signed and sealed as of the date of its presentation, and ordered to be filed *nunc pro tunc* as of that date. *Ferris* v. *Commercial Nat. Bank,* 158 Ill. 237.

Our conclusion upon these preliminary matters is, that the cross-errors assigned on the supplemental record can not prevail, and that the motion to strike from the record the bill of exceptions taken by plaintiffs in error must be overruled.

The record brought before us by the writ of error is that of an action of trespass *quare clausum fregit* prosecuted in the circuit court of Cook county by the Morrison, Adams & Allen Company, a corporation, against the West Chicago Street Railroad Company, the West Chicago Street Railroad Tunnel Company and Charles T. Yerkes.

On February 14, 1890, the Morrison, Adams & Allen Company, then known as the Morrison, Hanna & Allen Company, was occupying and engaged in business in a

room 40 feet front by 128 feet deep, the same being the north half of the first floor of the building known as Nos. 202 to 212 South Clinton street, in the city of Chicago. It was engaged in the manufacture of putty, paints and painter's supplies, and was doing a profitable and prosperous business.    It had traveling salesmen in Illinois, Indiana, Ohio, Michigan, Iowa, Minnesota and other western States, and in 1888 its business amounted to about $130,000 and in 1889 to about $150,000.    It had in use four putty mills, one lead mill, two mixing tanks, one steam tank, four iron mills, two canning machines and numerous other machines, and it got the power necessary for the operation of its machinery by means of a system of steam-pipes which supplied with power the numerous tenants of that and the adjoining building.    It had on hand at the time of the alleged trespass, merchandise worth about $20,000.    On Saturday night, February 14, 1890, the officers of the manufacturing company closed up the factory for the week and went to their respective homes.    At an early hour on Sunday morning, February 15, 1890, a large force of men,—some of the witnesses say as many as fifty or sixty,—divided into three squads and each squad under the command of a separate officer, and the whole force under the command of one Artingstall, who was chief engineer of the West Chicago Street Railroad Tunnel Company, marched to the building.  The men had pick-axes, crow-bars, sledge-hammers, axes, shovels and other similar tools, and led on by Artingstall, who says that he "headed the column of the attacking party," effected an entrance into the building through the basement, over the objections of two employees found on the premises.    The men then went to work with the implements they had and tore off the roof of the building, broke out the windows, broke down partitions, broke the water-pipes and steam-pipes, cut the belting, broke the shafting, broke the connections leading to a tank on the top floor of the building which contained about 2000

gallons of water, which was thereby discharged upon the premises, flooded the building with water and filled it with steam, and greatly injured and damaged the machinery, merchandise and property of defendant in error. The avowed object and intention of the raiders, were to dismantle the building so that it could not be used and so that business could not be carried on there the next day; to make it untenantable, and then tear it down and destroy it, in order to start work on a tunnel under the Chicago river.

To the declaration filed by the Morrison, Adams & Allen Company in its suit, the defendants below, plaintiffs in error here, interposed pleas of not guilty, *liberum tenementum*, and license. A jury trial resulted in a verdict and judgment in favor of the plaintiff company and against the West Chicago Street Railroad Company, the West Chicago Street Railroad Tunnel Company and Charles T. Yerkes for $31,500 damages, and the latter have brought the case to this court by writ of error.

Three grounds are relied on for the reversal of the judgment: First, that the judgment in the court below is an entirety—that it must be reversed as to the West Chicago Street Railroad Company because there is no evidence tending to show that said company had anything to do with the entry into the premises in question, and that therefore it must also be reversed as to the West Chicago Street Railroad Tunnel Company and Charles T. Yerkes; second, that the West Chicago Street Railroad Tunnel Company was the owner of the premises at the time of the entry, and then had a present right of immediate possession, and therefore was not a trespasser; and third, that the damages are excessive. We will consider these alleged grounds for reversal in their order.

*First*—To the claim that there is no testimony tending to prove that the street railroad company was a party to the trespass, a counter-claim is interposed by defendant in error. This counter-claim is, that plaintiffs in error

admitted in their plea of *liberum tenementum* that the street railroad company, and the other defendants, as its officers and servants, and at its request and command, made the entry and committed the trespasses of which complaint is made, and by their plea of license confessed an entry by the officers and servants of the West Chicago Street Railroad Company, acting for it, and that therefore it is an admitted fact upon the record, without further evidence, that the West Chicago Street Railroad Company made the entry. Even if we accept this as a correct conclusion as to the statements of the special pleas, yet the claim made is not well grounded. Defendants may plead as many different matters of fact in several pleas as they may deem necessary for their defense, —and this, even though the different alleged grounds of defense are inconsistent or contradictory; and one plea cannot be taken advantage of to help or vitiate another, and is not either an admission or evidence of a fact denied in another. (Practice act, sec. 29; 1 Chitty's Pleading, 562, 563.) Here a plea of not guilty was filed, and in trespass, where the general issue is pleaded, a special plea in justification does not obviate the necessity of proving the trespass. It is also a rule applicable to trespass, as well as to all other actions at law, either for torts or upon contracts, that the judgment is a unit as to all of the defendants against whom it has been rendered, and cannot be reversed as to one or more of them and affirmed as to the others, but if erroneous as to one is erroneous as to all. 1 Chitty's Pleading, 86; *McDonald* v. *Wilkie*, 13 Ill. 22; *Jansen* v. *Varnum*, 89 id. 100; *Ragor* v. *Kendall*, 70 id. 95; *Claflin* v. *Dunne*, 129 id. 241.

The question then arises, is it true that there is not in the record any evidence tending to show that the West Chicago Street Railroad Company had anything to do, directly or indirectly, with the entry into the premises occupied by defendant in error?

The evidence shows that on April 2, 1888, said street railroad company procured the passage of an ordinance by the city of Chicago authorizing and permitting it to construct a tunnel under the Chicago river, from Clinton street to Franklin street, and connecting the west side with the south side of the city, and it is clearly deducible from the evidence that said company, probably because it had no power under its charter to make such tunnel, instead of constructing the same in its own name caused to be organized a corporation known as the West Chicago Street Railroad Tunnel Company, which became the apparent builder and owner of such tunnel. The capital stock of the tunnel company was $750,000, and the whole of it, except five shares held by the five directors (one share each) for the purpose of qualifying them to act as directors, was held by Charles T. Yerkes, as president of the West Chicago Street Railroad Company, as trustee for the stockholders of the said street railroad company. The lands and real estate required for the uses and purposes of the tunnel were acquired by and in the name of Horace A. Hurlbut, the secret agent and trustee of the tunnel company, to which he afterward conveyed them. The mortgage agreement between the street railroad company, the tunnel company, and the Illinois Trust and Savings Bank, dated February 1, 1889, acknowledged April 25, 1889, and recorded April 26, 1889, shows that the tunnel company was to issue $1,500,000 five per cent twenty year bonds, secured by trust deed upon the tunnel and lands, and that the rentals of said lands were to go, as far as may be, to pay interest on the bonds, taxes, insurance and other expenses, and that the street railroad company was to make up the deficiency. It also shows that the tunnel was to be under the exclusive control of the street railroad company for 999 years, and that it was to be kept in repair at the expense of the street railroad company; that the street railroad company was to guarantee all of the tunnel company's bonds, and that the

tunnel company was to receive a yearly toll on each and every car drawn by the street railroad company through the tunnel during the 999 years, the amount of such toll to be agreed upon thereafter, but always and in any event to be enough to make good any deficiency between the net rentals and the interest on the tunnel company bonds. And it further shows that the bonds and the mortgage were to be renewed or extended, from time to time, upon the request of the street railroad company, and that the construction by the tunnel company of the tunnel was to "be taken and considered as and for the construction of a tunnel by the street railroad company itself."

This evidence, it seems to us, fairly and clearly tends to show that the tunnel company was a mere means or mode adopted by the street railroad company for the construction of its tunnel,—a mere instrument or tool used for that purpose,—and that the tunnel company was organized and acted simply as the agent or servant of the street railroad company. Yerkes was the president of the street railroad company, and the evidence shows that he was the prime mover and instigator of the proceedings whereby an entry was made into the premises occupied by defendant in error, and said premises and the property therein injured and destroyed. Indeed, it appears even from the tunnel company's answer filed in the injunction suit and here in evidence, which answer was sworn to by Yerkes, that "instructions were given by Charles T. Yerkes to the engineer in charge to take possession of said Clinton street building, and, inasmuch as it had been determined by this defendant and the contractors that it would be absolutely necessary to take down the said Clinton street building in order to construct the tunnel, to also proceed to do such work." Yerkes had no personal or individual interest in the matter except indirectly through his interest and his official position in the street railroad company. While he was one of the board of directors of the tunnel company, yet

he could not individually exercise the powers of said board, and he was not the president or other executive officer of that company. It is admitted by counsel that the jury found by their verdict that Yerkes, acting as president of the street railroad company, gave the order for taking possession of and demolishing the building, and from the evidence we have referred to, and from the testimony of the engineer, Artingstall, Downey, and other witnesses, and from the evidence as a whole, considered in the light of the surrounding circumstances, we are unable to say that the jury were not authorized to find that the street railroad company was a party to the trespass, —in fact, we think they were fully justified in so doing.

*Second*—It is urged that the tunnel company was the owner of the building containing the premises in question, and on the 15th day of February, 1890, had a right to the immediate possession of said premises, and by its agents and servants made an entry without committing a breach of the peace.

On October 15, 1888, Warren Springer was the owner of the land and of the building thereon, and the premises in question were located in said building. Defendant in error was then occupying, and for several years prior thereto had occupied, said premises as tenant of Springer. On that day Springer again leased to it the premises for a term to commence on February 1, 1889, and to run until February 1, 1890, at a rental of $146 per month, payable monthly in advance. On December 1, 1888, Springer, by warranty deed of that date, conveyed the land and building to Horace A. Hurlbut, which deed was acknowledged on December 29, 1888, and filed for record on February 4, 1889, and on the day of the date of the deed, December 1, 1888, a contract in writing and under seal was entered into between said Hurlbut and said Springer, which, among other things, constituted Springer the agent of Hurlbut for the collection of rents from defendant in error and other tenants of the building. Thereafter defendant in

error continued to pay its rents to Springer, and Springer settled for the same with Hurlbut. On November 27, 1889, Hurlbut conveyed the property, by quit-claim deed, to the West Chicago Street Railroad Tunnel Company, which deed, however, was not filed for record until December 13, 1889. About the time of the conveyance from Hurlbut to the tunnel company defendant in error was engaged in making an arrangement for renting, for the purposes of its business, the Schwabacker building, on North Canal street, for a term of six years, from January 1, 1890, to December 31, 1895, at a rental of $187.50 per month from January 1 to May 1, 1890, and a rental of $375 per month for the residue of the term, and on or about December 1, 1889, the officers of defendant in error communicated to Springer the fact that their company was renting a place for its business, but could not get it ready in time to get into it and get out of the premises in the Springer building by the first day of February, 1890, and the desire of their company to remain in the latter place after the termination, on February 1, 1890, of its lease. Thereupon a verbal arrangement was made between defendant in error and Springer, whereby it was agreed that the former should remain in the premises after the expiration of the lease of October 15, 1888, at the same rental of $146 per month, payable in advance, and defendant in error to be given thirty days' notice before possession was wanted. Thereupon Springer, accompanied by Morrison and Allen, the officers of defendant in error, at once went to the office of Hurlbut, where Springer introduced Hurlbut to Morrison and Allen, and Hurlbut was informed of the situation and of the foregoing arrangement, and Hurlbut responded: "You needn't be in a hurry. We will give you thirty days' notice. I will give Mr. Springer thirty days' notice before we want possession." The evidence shows that the rent for the month of February, 1890, ($146,) was paid by defendant in error to Springer, as theretofore, and that it continued

in possession after the expiration of its written lease. It also shows that no demand for possession was made or notice given, other than this: that at about four o'clock in the afternoon of the Saturday immediately preceding the Sunday morning of the alleged trespass, Artingstall, the engineer of the tunnel company, went to the office of defendant in error and said to Morrison that he would have to move right away; that Morrison told him that they couldn't move on short notice like that, and that they had an arrangement that they were to have thirty days' notice, to which Artingstall responded, "You will have to move damn quick," and turned around and walked out.

It is urged that in respect to the powers delegated to Hurlbut and Springer, or either of them, the testimony shows nothing more than an agency to collect rents, but no authority to make a lease to defendant in error. Plaintiffs in error employed Hurlbut as a secret agent and trustee, and procured him to purchase the land and building in his own name, and to take a title thereto which was absolute on its face, by a deed that afforded no indication of any trust or agency, and to have such conveyance spread upon the public records of the county, and also allowed him to collect rents, and to execute in his own name a lease or leases for portions of the building. So far as concerned third persons dealing with him without notice of the secret agency and trust, he was the absolute owner in his own right, with full power and authority to convey, lease or otherwise contract in regard to the property, or any part thereof, or any interest therein. It is true that about the last of November, 1889, Hurlbut executed and delivered to the tunnel company a quit-claim deed for the property, and that as between Hurlbut and said company the transfer of title was at that time complete; but as between the tunnel company and third persons without notice the transaction was not complete until the quit-claim deed was filed for record,

and that was not until December 13, 1889. Section 30 of the Conveyance act provides, that "all deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers without notice, and all such deeds and title paper shall be adjudged void as to all such creditors and subsequent purchasers without notice until the same shall be filed for record." Plaintiffs in error having withheld the quit-claim deed from record until December 13, 1889, and defendant in error having in the meantime, on or about December 1, 1889, without notice of the conveyance to the tunnel company, made the verbal arrangement and contract above mentioned with Hurlbut, the record owner of the property, it follows that the tunnel company took the property subject to such arrangement and agreement, provided the same was otherwise a valid contract. On the other hand, defendant in error was in the actual, open and visible possession of the premises here involved, and such possession was constructive notice of all its interests and rights whatever in such premises. *Haworth* v. *Taylor*, 108 Ill. 275.

Under our recording laws the instrument first filed for record takes priority, without regard to the time of its execution. (*Delano* v. *Bennett*, 90 Ill. 533; *Simmons* v. *Stum*, 101 id. 454.) And actual, open and visible possession is the same, in effect, as the filing for record of an instrument of conveyance, and is regarded as notice equal to the recording of such an instrument. (*Cabeen* v. *Breckenridge*, 48 Ill. 91.) The date of notice, under the Recording act, is not the date of the instrument, but the date of filing for record, or of possession that is equivalent to recording, and priority of notice gives priority of right. (*Doyle* v. *Teas*, 4 Scam. 202.) If Hurlbut had made a deed of the fee, or a formal lease, under seal, for a term to defendant in error, it not having notice of the prior con-

veyance to the tunnel company, and such deed or lease had been recorded before December 13, 1889, then the quit-claim deed would have been subordinated to the title or term conveyed or demised to defendant in error; and the same result follows if there was a verbal contract for renting the premises from month to month, to begin on February 1, 1890, and defendant in error being in actual, open and visible possession.

It is insisted that the testimony does not show the making of a new lease, because, in the arrangement made by the officers of defendant in error with Springer and Hurlbut, nothing was said about a new lease. The court will look at the substance of the agreement that was made and the evident intention of the parties, and if what was agreed upon was in fact a leasing or renting for an additional term, to commence on the expiration of the old lease, it is immaterial that the word "lease" was not used in respect thereto. Greater regard is to be had to the clear intent of the parties to an agreement than to any particular words that may have been used in the expression of that intent. *Field* v. *Leiter*, 118 Ill. 17.

The lease of October 15, 1888, was under seal, and in it defendant in error covenanted that it would, at the termination of the lease, by lapse of time or otherwise, yield up immediate possession of the premises to the party of the first part, and said lease also contained this provision : "It is expressly agreed, between the parties hereto, that if default be made in the payment of the rent above reserved, or any part thereof, or in any of the covenants and agreement herein contained, to be kept by the party of the second part, it shall be lawful for the party of the first part or his legal representatives, on his or their election, without notice, to declare said term ended and to re-enter said demised premises, or any part thereof, either with or without process of law, and the said party of the second part, or any person or persons occupying the same, to expel, remove and put out, using

such force as may be necessary so to do, and the said premises again to repossess and enjoy as in his first estate, without prejudice to any remedies which might otherwise be pursued for arrears of rent or breach of preceding covenants."

Plaintiffs in error urge that if Hurlbut did anything, he merely made a verbal agreement with defendant in error, through Morrison and Allen, its officers, in the presence of Springer, that the above mentioned and above quoted provisions of the lease under seal should be so changed as to provide for thirty days' notice to the lessee by the landlord before the lessee should be required to move, and that under the law such verbal agreement can not be given effect, because of the well settled rule of the common law that an executory contract under seal can not be varied or modified by a parol agreement. The common law rule thus relied on has frequently been recognized and followed in the decisions of this court. (*Baker* v. *Whiteside*, Breese, 174; *Chapman* v. *McGrew*, 20 Ill. 101; *Hume* v. *Taylor*, 63 id. 43; *Barnett* v. *Barnes*, 73 id. 216; *Loach* v. *Farnum*, 90 id. 368; *Baltimore and Ohio and Chicago Railroad Co.* v. *Illinois Central Railroad Co.* 137 id. 9.) We think, however, that this case does not fall within the purview of that rule. The term created by the lease under seal came to an end with the last day of January, 1890; but prior to that date, and about December 1, 1889, an agreement was made which was a verbal lease or renting of the premises from month to month, to begin on February 1, 1890, at the termination of the former lease, at a monthly rental of $146, payable monthly in advance, with a provision that the lessor could terminate the lease or holding only by giving thirty days' notice that possession was wanted. We are unable to see why it was not entirely competent for the lessor in the prior lease under seal, or his assignee, to make such an arrangement with the lessee on December 1, 1889, and prior to the expiration of the lease of 1888, or why such arrangement

would not constitute a valid and binding contract between the parties. The rents that were to be paid under the verbal agreement were no portion of the rents that were covenanted to be paid in the lease under seal, nor were they for any part of the term limited by that lease, and it has been held that the promise of a lessee to pay rent is a sufficient consideration for an agreement to lease to him. *McFarlane* v. *Williams*, 107 Ill. 33.

If we are right in our conclusions, then, at the time of the entry of plaintiffs in error, by their servants and agents, into the premises, the defendant in error was, and had been for more than two weeks, in the lawful and peaceable possession of the same under a valid tenancy by the month, and the tunnel company did not have a present right of immediate possession, and the entry made was a trespass and a tort, for which defendant in error is entitled to recover damages.

*Third*—It is claimed that the damages are excessive, and as a subdivision of such claim the point is made that the court erred in admitting certain evidence tending to show the amount of damages caused by the interference with defendant in error in manufacturing and in carrying on its business. This contention is based on the fact that provision was made in the lease of October 15, 1888, that the lessor should be allowed for each year of the term, for repairing machinery, ten working days, during which no power, live steam or heat need be furnished to the lessee, and that there was therein a further provision, as follows: "For and in the event of the failure of said first party to provide steam power as herein set forth, through accident or otherwise, it is especially agreed and understood that the liability of said first party shall be limited to the amount of six dollars per month liquidated damages for each horse power hereby leased by said lessor." And that the evidence tended to show that it took a twenty horse power to run the machinery of defendant in error as it stood on the day of the entry. It is a per-

version of these provisions of the lease to attempt to apply them for the purpose of limiting the recovery of damages for the willful, wanton and malicious trespass that this record discloses. They clearly have reference to an entry by the landlord for the purpose of repairing machinery, and to damages growing out of a want of steam power, and the consequent stoppage of machinery for repairs or other legitimate purpose. The expression "through accident or otherwise," is broad enough to include wear and tear, breakage from inherent defects, or even simple negligence or the torts of others. But these provisions did not contemplate a willful trespass by the landlord and destruction of property and business, and make arrangement in advance for liquidated damages for a tort of that kind.

Plaintiffs in error insist that the actual damages proved amount to less than $10,000, and, on the other hand, defendant in error urges that the jury under-estimated the actual damages. We are not inclined to critically examine the very voluminous testimony contained in the record for the purpose of determining which of these contentions is right, nor do we deem it necessary that there should be any close calculation made for the purpose of ascertaining the amount of actual damages, for in the view we take of the case all that was awarded by the verdict and judgment, over and above actual damages, may well have been included as exemplary damages. The conduct of plaintiffs in error was insolent and oppressive, and the trespass willful, malicious and reckless, and characterized by acts of indignity and humiliation towards defendant in error and its officers. It is a proper case for exemplary damages, and one in which the law should afford substantial protection against such outrages in the way of liberal damages, that the public tranquility may be preserved by saving the necessity of a resort to violence as the only means of redress. (*Alcorn* v. *Mitchell*, 63 Ill. 553; *Illinois and St. Louis Railroad and*

*Coal Co.* v. *Cobb,* 68 id. 53; *Cutler* v. *Smith,* 57 id. 252.) The language of this court in *Jasper* v. *Purnell,* 67 Ill. 358, seems peculiarly applicable here. It was there said (p. 360): "If a party can thus violate the law and trample upon the rights of the citizen with slight punishment, there is no security for any possession—no protection for property. The whole conduct of the parties was an outrage upon individual rights and upon the law, and all the circumstances indicate wantonness and malice. In such a case exemplary damages were properly awarded, and no court should weigh the testimony nicely for the purpose of reducing the amount."

We find no error in the record that requires a reversal of the judgment, and it is affirmed.

*Judgment affirmed.*