Dan Longo, Plaintiff-Appellee, v. F. J. Lewis,
Defendant-Appellant.

Gen. No. 33,104.

Opinion filed April 17, 1929.

NELSON, WILSON & MCFALL, for appellant.

SCHNACKENBERG & HANSEN, for appellee; ELMER J. SCHNACKENBERG, of counsel.

MR. JUSTICE RYNER delivered the opinion of the court.

Under date of October 10, 1925, the plaintiff, Dan Longo, addressed a written proposal to McGrath & Swanson Construction Company at Chicago, Illinois, in which he offered to do the necessary filling upon a tract of approximately two hundred acres of land, located in the southern portion of the City of Chicago and bounded on the east by the Illinois-Indiana state line, to bring the surface of the land up to six inches below the established grade. The work was to be done at a cost of fifty cents per cubic yard, payments to be made weekly as the work progressed on the basis of eighty-five per cent of the cost of the work completed. The remaining fifteen per cent was to be paid when all of the work had been done. The document was received in evidence and at the bottom of it and below the signature of the plaintiff appeared the words:

"Accepted:

"McGrath & Swanson Const. Co.

"A. S. Billingsley."

On May 9, 1927, the plaintiff brought his suit in the superior court of Cook county against the defendant, F. J. Lewis. The declaration consisted of the common counts. An affidavit of claim was attached in which the plaintiff stated that his demand was for "work and labor furnished to the defendant, F. J. Lewis, at his special instance and request" and that there was

due to the plaintiff the sum of $17,771.04. The defendant filed a plea of the general issue and an affidavit of merits. The affidavit set out in *haec verba* the written proposal and concluded "that all of the work and labor and material done and performed by the said plaintiff in the said declaration mentioned was done and performed at the special instance and request of the said McGrath & Swanson Construction Company, a corporation, and not at the special instance and request of this defendant." It was executed by Billingsley as agent for the defendant.

A jury trial was had, resulting in a verdict and judgment upon the verdict in favor of the plaintiff for the full amount claimed together with interest and costs. The defendant appealed.

Much of the brief filed by counsel for the defendant is devoted to the presentation of authorities which announce well recognized principles of law but having no application to the facts in the instant case. Plaintiff does not charge fraud nor does he ask that corporate entities be ignored. He takes the position that his judgment should stand or fall on the proposition as to whether he adduced sufficient evidence upon the trial to warrant a jury in finding that, in the transaction in question, the defendant was an undisclosed principal acting through the McGrath & Swanson Construction Company as his agent.

There is little conflict in the evidence. The principal witnesses were the defendant and his agents and employees. The defendant, according to the statement of his attorney, was a man of considerable means and reputed to be worth $13,000,000. He conducted his business through about fifteen corporations in which he owned all of the stock except a few shares used for the purpose of qualifying directors and officers. The officers and directors of the various corporations were employees of the defendant or of some one or more of the corporations organized by him. The principal

corporations involved in this proceeding are the Mc-Grath & Swanson Construction Company, the Forest Preserve Real Estate Improvement Corporation and the F. J. Lewis Manufacturing Company.

The lands which the plaintiff improved were purchased with the moneys of the defendant and he was the equitable owner of them. As he acquired them parcel by parcel he had the legal title, at first, placed in certain individuals and finally in the Forest Preserve Real Estate Improvement Corporation, where it remained at the time of the proceedings in the trial court. The president of this corporation was a brother of the defendant, and O'Connor, the secretary and treasurer, was an accountant employed by the F. J. Lewis Manufacturing Company. Ernest Swanson was one of the incorporators. He was also an officer of the company but testified that he knew nothing about the assets or who was president or who the directors were. He said this notwithstanding the fact that he also testified that he had custody of the minutes of the meetings of the company. He was assistant superintendent of the F. J. Lewis Manufacturing Company and secretary and treasurer of the McGrath & Swanson Construction Company. The other incorporators were Lux, the personal attorney of F. J. Lewis, and A. L. Schoeman, a stenographer in the office of the F. J. Lewis Manufacturing Company.

The defendant testified that he caused to be organized the Forest Preserve Real Estate Improvement Corporation and the other corporations because of the uncertainty of life; that he followed the advice of men of large affairs to the effect that it was better to operate through corporations than, at his death, to have his personal estate tied up and involving many people. Attorney Lux testified that he recommended the incorporation of the Forest Preserve Real Estate Improvement Corporation. He gave as his reasons for

the suggestion that it was contemplated the company should own a large amount of unimproved land which would require a long time to improve and it was unwise, from an economical view, to tie up such an immense project with the life of one man. He further testified that the defendant's health was very delicate at times.

Raymond E. McGrath testified that he was president of the McGrath & Swanson Construction Company. He was the traffic manager of the Liquid Dispatch Line, which had its place of business at the office of the F. J. Lewis Manufacturing Company. Attorney Lux asked him to be an officer. He paid no money but received a certificate of stock which he indorsed in blank and turned over to Lux. He never saw the lands in question except once when he drove by them on a pleasure trip. He further stated that Billingsley was the general manager of the company but he did not know who appointed him and that he was not consulted in the matter. He was not connected with the outside work in the subdivision and had no consultations with Billingsley about the contract with the plaintiff. He did not know the terms of the contract and knew nothing about the assets of the company.

Ernest Swanson testified that he was assistant superintendent of F. J. Lewis Manufacturing Company, superintending the repair of tank cars. He acted as secretary and treasurer of the McGrath & Swanson Construction Company at the request of Lux. He devoted all of his time to the affairs of F. J. Lewis Manufacturing Company, and never saw the lands in question. He did not know what salary Billingsley received. Otherwise his testimony was almost identical with that given by McGrath. Neither one paid the slightest attention to the company's affairs, if any it had.

Lux testified that he had been the attorney for the defendant since 1920 and that he received a salary from

F. J. Lewis Manufacturing Company. One thousand dollars was paid in on the capital stock of the McGrath & Swanson Construction Company. Lux held the certificates of stock for the benefit of the ultimate owners. He advised the defendant to have the Company organized so that the development of the lands in question would be in the hands of one organization with its own competent mechanics, engineers and architects. The object, he stated, was to relieve the defendant from the burden of advertising for and considering bids and attending to the letting of contracts to various contractors.

On the trial of the case the attorney for the defendant said the various corporations were not organized for the purpose of deceiving anybody but to relieve the defendant from responsibility "so that he wouldn't be pestered on account of credit relations with the banks." When the court asked him what tangible assets the McGrath & Swanson Construction Company had, he replied, "They have responsibility back of them." He admitted that the defendant's moneys paid for the lands.

Billingsley testified that in 1924 he had been employed by the F. J. Lewis Manufacturing Company. He was an engineer and for about three and one-half years was in charge of the work of improving the property. At first his salary was paid by checks of the F. J. Lewis Manufacturing Company, but later he started getting checks from McGrath & Swanson Construction Company. He and the plaintiff prepared the contract. He discussed the proposal of the plaintiff with the defendant and the latter advised him to enter into the contract. He further stated that if the defendant had advised against accepting the proposal the matter would probably have been held up. The defendant was frequently upon the premises, consulting with the witness about the improvements. No official of the McGrath & Swanson Construction Company

was ever there. Three small buildings were erected for office facilities. The matter of constructing these buildings was discussed with the defendant but not with McGrath or Swanson. He observed officers of the Forest Preserve Company going over the property and inspecting the work done. The officers mentioned by him were the defendant and his brother. He looked to the defendant for instructions as to work to be done and made many estimates to him in connection with possible special sales. When asked about the assets of the company he said it had operating equipment; that he could not give the amount of tangible assets without reference to the books, but that he would say that it had physical assets of $10,000 to $15,000 in equipment alone.

The defendant testified that he was chairman of the board of directors of the F. J. Lewis Manufacturing Company and interested in a large number of other business enterprises. He reluctantly admitted that he furnished part of the money for the acquisition of the lands. He thought that his attorney held the custody of the deeds. He thought the Forest Preserve Real Estate Improvement Corporation was the grantee in the deeds but if not, it would be his brother. He could not tell who suggested placing Billingsley in charge of the improvements, yet he admitted that Billingsley showed him the proposal of the plaintiff and he approved it as being satisfactory as to form and price, and directed that it be accepted. He further said that in 1925 he was appointed an agent of the McGrath & Swanson Construction Company.

The financing of this company sheds a great amount of light upon the transaction here involved. Its authorized capital stock was $20,000. The amount of stock subscribed and paid for was ten shares of the par value of $100 each. The defendant admitted that since its incorporation in 1924 he had advanced money to the company to the extent of $200,000 or $300,000. Coun-

sel for the plaintiff contends that the record discloses an advancement of several hundred thousand dollars in excess of this amount. There was paid to the plaintiff on account of his contract, as evidenced by forty checks introduced in evidence, the sum of $56,731.66. One of the checks was signed, "Frank J. Lewis Trust, W. H. Lewis," three were signed "Frank J. Lewis Trust, by F. J. Lewis," nine were signed "F. J. Lewis, by W. H. Lewis," and twenty-seven were signed "F. J. Lewis by F. J. Lewis." The Frank J. Lewis Trust was one of the defendant's numerous creations and W. H. Lewis was his brother. The defendant's attorney, Lux, supervised the issuance of the checks and caused them to be charged to the account of the McGrath & Swanson Construction Company. He said that the purpose of issuing the checks was to make a loan to the company to enable it to pay its obligations. This would seem to indicate quite clearly that the company had no funds.

The defendant was a shrewd business man. His counsel admits that because he says in his brief, "Lewis and Billingsley had enough intelligence to have a contract executed in the form it was intended to be executed." If he was loaning hundreds of thousands of dollars to this company what security or what guaranty of a repayment of these large advancements did he have? The company had never declared a dividend and the only assets it appeared to have were about $15,000 worth of equipment. This was evidently paid for with money of the defendant.

The plaintiff and his brother, Anthony Longo, testified that the defendant was frequently on the premises being improved, and expressed his approval of the work done.

The plaintiff also testified that the checks aggregating the sum of $56,731.66 received by him were in payment of 85 per cent of the work done and that there was

due him under his contract a balance of $17,771.04. To this testimony no objection was interposed.

The plaintiff produced enough proof to make out a clear prima facie case, sufficient to require the defendant to make a showing that the Forest Preserve Real Estate Improvement Corporation and the McGrath & Swanson Construction Company were the real parties in interest in connection with the transaction here involved. Particularly was it incumbent upon the defendant to offer some explanation to account for the total lack of knowledge on the part of the officials of the McGrath & Swanson Construction Company of the making of the contract with the plaintiff or of the work being done under it. This he wholly failed to do. He offered no evidence to show the source of Billingsley's authority to make the contract or supervise the work on behalf of the company. We have the conclusions of the witnesses that he was appointed general manager but by whom is not disclosed. It requires no exercise of the imagination to infer that he was appointed by the defendant. Likewise no evidence was offered to show that the company had any moneys with which to make payments under the contract. The inference is that it had none, because all payments were made by the defendant. No attempt was made to show that the company had any contract or understanding whereby it was to receive from anybody reimbursement for moneys paid out under the contract or any compensation by way of profit, commission or otherwise for having the improvements made.

Counsel for the defendant says that he was deprived of the opportunity to present all of the facts because he was taken by surprise at the wide latitude allowed by the court in permitting the introduction of evidence not pertinent to the issues raised by the pleadings. But he had no occasion to be surprised. The declaration and affidavit of claim warned him that the plaintiff was

seeking to hold the defendant personally liable. The nature of the plaintiff's claim was fully recognized by the affidavit of merits, which set out the contract in *haec verba* and charged that it was not the undertaking of the defendant.

Finally it is said that there was no proof made that the plaintiff performed his contract. He was permitted to testify, without objection, as to the amount of the balance due him. In addition to this, the defense of failure to perform was not mentioned in the affidavit of merits. Inferentially it admitted compliance by the plaintiff on his part. Counsel says that this defense was not available to the defendant because his defense was that he was not bound by the contract and he could not make the defense on behalf of the McGrath & Swanson Construction Company. The contention is wholly without merit. The defense of failure of performance would have been consistent with the defense of non-liability.

The question presented by this appeal is not a new one. It has been passed upon by the Supreme Court of this state many times. It cannot be disputed that a corporation as well as a natural person may act as the agent for an undisclosed principal. Likewise it must be conceded that a party to a contract, upon discovery of the fact that he has been dealing with the agent of an undisclosed principal, may hold the latter liable in damages for any breach of the contract.

In the case of *Chicago Economic Fuel Gas Co. v. Myers,* 168 Ill. 139, the question arose as to the liability of the Economic Fuel Gas Company to respond in damages for injuries sustained by Myers in connection with the laying of certain gas mains and pipes in the City of Chicago. The defense was that the work was being done by an independent contractor, the Chicago Contract Construction Company. We quote at length from the opinion of the court because of the many facts re-

cited which bear close resemblance to the facts in the case at bar, as follows:

"We are of the opinion, however, that the doctrine of 'independent contractor' does not apply to the present case. In the first place, the construction company was a mere means or mode, adopted by the gas company for the construction of its system of gas-pipes and gas works. The construction company was a mere instrument or tool used by the gas company for that purpose. The evidence tends fairly and clearly to show, that the construction company was organized and acted simply as the agent or servant of the appellant company. An attempt is here made to evade liability by interposing a construction company as the guilty party. The officers of the gas company were also officers of the construction company. The construction company and the gas company had their offices in the same building, the offices of the gas company being on the first floor and the offices of the construction company being on the second floor. One Judson was the president of the gas company, and at the same time was consulting and supervising engineer of the construction company. One Yuille was paymaster of the construction company and also an officer of the gas company. One Bryant was supervising the office and fixtures of the construction company in December, 1893, and was also secretary and treasurer of the gas company. One Jelps was in the employ of the gas company and left such employment and worked for the construction company, but at once went back into the service of the gas company. All the officers and employees of the construction company, who testified in this case, were either at the same time connected in some way with the gas company, or passed alternately from the service of one to the service of the other. The contract between the construction company and the gas company contained a provision, that

the size of the pipes to be laid should be determined by the gas company; and there are other provisions in the contract, which go to show that the gas company was not to be entirely without control and supervision over the construction of the pipes and the gas plant. The evidence shows, that, on the afternoon of December 1, 1892, two or three hours before the accident occurred, Judson gave the order for letting the natural gas into the pipes; and he testifies, that he is unable to state whether he gave such order as the president of the gas company, or as the supervising engineer of the construction company. Certain it is, that he supervised the construction of the gas-pipes and the gas plant; and it is just as natural to suppose, that he did it as the president of the gas company, as that he did it as the supervising engineer of the construction company. The law is quite clear, that a corporation cannot thus shift its responsibility upon another corporation which is its mere agent and tool. It cannot be doubted, that, if the appellant had employed a natural person to construct its gas-pipes and mains, and used them for the purpose of passing its own gas through them during the process of construction, it would be liable jointly with such natural person for its torts. 'There is no magic in a corporate organization, where the corporation itself is in fact employed for the accomplishment of the same result, which can exempt the employer from the same responsibility.' (*Kankakee Railroad Co. v. Horan, supra; West Chicago Street Railroad Co. v. Morrison, etc. Co.*, 160 Ill. 388)."

See also *West Chicago St. R. Co. v. Morrison,* 160 Ill. 288; *Auto Parts Co. v. Roberts,* 194 Ill. App. 417; *Gause v. Venango Const. Co.,* 188 Ill. App. 130; *Limousine & Carriage Mfg. Co. v. Shadburne,* 185 Ill. App. 403.

The McGrath & Swanson Construction Company was a mere empty shell. Its principal officers were

totally ignorant of any activities on its part. It had no money and it had no assets of any consequence. Those it did have were seemingly paid for with moneys of the defendant. All of the facts and circumstances justify the inference that the defendant appointed himself as agent of the company and that he likewise, without knowledge of the president and secretary of the company, designated Billingsley as general manager. The defendant told Billingsley to enter into the contract with the plaintiff. The contract was made for the sole purpose of improving lands belonging to the defendant. True, the legal title was held by one of the defendant's numerous corporations, but there would have been no difficulty in shifting the title upon a moment's notice. The contract entered into with the plaintiff was the defendant's personal obligation.

The judgment of the superior court of Cook county is affirmed.

*Affirmed.*

HOLDOM, P. J., and WILSON, J., concur.